UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AARON SINGER, PLAINTIFF, V. INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT (IMPD), et al., DEFENDANTS. | ) ) ) ) ) ) | No. 1:25-cv-00870-JPH-MKK |

FILED
10/27/2025
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

**FIRST AMENDED COMPLAINT**

Plaintiff Aaron Singer, pursuant to **Fed. R. Civ. P. 15(a)(2)** and this Court's Scheduling Order permitting amendment, respectfully files this **First Amended Complaint**, which supplements and supersedes his original complaint filed on **May 2, 2025**.

Plaintiff Aaron Singer is proceeding in this action **in forma pauperis** pursuant to the Court's prior Order granting such status in this matter. All filing fees and costs associated with this First Amended Complaint are hereby waived in accordance with that Order.

This Amended Complaint adds causes of action under **18 U.S.C. §§ 1961–1964** (Civil RICO), **Indiana Code § 35-45-2-2** (Harassment), and **18 U.S.C. § 1512** and/or **Indiana Code § 35-44.1-2-2** (Obstruction of Justice), and clarifies the factual allegations concerning the incidents of **January 22–23**, **February 25**, and **June 22–26**, 2025.

**COUNTS**

**State-Law Claims**

I. Battery – **Ind. Code § 35-42-2-1** (Level 5 Felony – Use of Deadly Force)

II. Kidnapping – **Ind. Code § 35-42-3-2** (Level 3 Felony – Use of Deadly Force)

III. False Imprisonment (Criminal Confinement) – **Ind. Code § 35-42-3-3** (Level 3 Felony – Use of Deadly Force)

IV. Conspiracy to Commit Sexual Battery – **Ind. Code § 35-42-4-8**, § 35-41-5-2** (Level 4 Felony)

V. Official Misconduct – **Ind. Code § 35-44.1-1-1** (Level 6 Felony)

VI. Harassment – **Ind. Code § 35-45-2-2** (Level 6 Felony)

VII. Obstruction of Justice – **18 U.S.C. § 1512** and/or **Ind. Code § 35-44.1-2-2** (Level 6 Felony)

**Federal Causes of Action**

1. 42 U.S. Code § 1983 - Civil action for Deprivation of Rights (Monell Municipal Liability)
2. 18 U.S.C. §§ 1961–1964 – Racketeer Influenced and Corrupt Organizations (Civil RICO)

**Constitutional Provisions Implicated**

1. **First Amendment** – Retaliation for Protected Speech
2. **Fourth Amendment** – Unreasonable Seizure and Search
3. **Fourteenth Amendment** – Due Process and Equal Protection

In support of these claims, Plaintiff states the following factual allegations, which are incorporated by reference as if fully set forth herein.

**FACTUAL SUMMARY**

1. **January 22–23, 2025 – Initial Incident.**

Plaintiff was unlawfully seized by Indianapolis Metropolitan Police Department (IMPD)

officers at the Carson Transit Center after attempting to speak with IndyGo management regarding prior grievances. He was transported to the Marion County Jail and subjected to forced nudity and "suicide watch" procedures, constituting unlawful seizure, sexual humiliation, and deprivation of due process.

2. **February 25, 2025 – Harassment Incident.**

IMPD officers tracked Plaintiff to the College Avenue Library (42nd Street and College Avenue), interrogated his former roommate, followed her to her residence, and subsequently waited outside flashing lights and shouting Plaintiff's name. The officers lacked any lawful basis or exigent circumstances, constituting harassment under Indiana Code § 35-45-2-2 and a continuing pattern of retaliatory conduct.

3. **June 22–26, 2025 – Retaliatory Arrest and Obstruction.**

While Plaintiff's federal civil rights action against IMPD was pending, IMPD Officers **Brendan Houston** and **Alex Woyak** arrested him on false charges, resulting in 4.5 days of unlawful detention. These officers and IMPD as a whole were aware of the Plaintiff's status as a federal witness in multiple federal cases. The charges were altered mid-detention from "Disorderly Conduct – Unreasonable Noise" to "Intimidation," demonstrating manipulation of process to obstruct justice. Following a bench trial, all charges were dismissed by Hon. Helen Marchal. This incident occurred near the same location as the February 25 harassment, evidencing a coordinated pattern of retaliation and racketeering conduct under 18 U.S.C. § 1962.

**STATEMENT OF FACTS**

**Initial Incident**

**Date and Time:**

January 22, 2025 ~11AM-~2PM with imprisonment lasting into January 23,2025

**Location:**

Carson Transit Center (Indygo public transit Central hub)

201 East Washington Street Indianapolis, IN 46204

and

Marion County Jail

675 Justice Way Indianapolis, IN 46203

**Defendants:**

Indianapolis Metropolitan Police Department (IMPD)

E125 – Youmans (IMPD police officer)

E124 – Shaffer (IMPD police officer)

E190 – Martin (IMPD police officer)

E290 – Robertson-Collins (IMPD police officer)

**Facts Underlying the January 22-23, 2025 Incident:**

**Initial Contact with Indygo Security and Management -** On January 22, 2025, between approximately 10:00 AM and 12:00 PM, the Plaintiff disembarked from a Red Line bus at the Carson Transit Center. Prior to arrival, the Plaintiff requested that the bus driver radio ahead to inform IndyGo personnel that he wished to speak with a manager regarding serious misconduct he had witnessed the previous day. Specifically, the Plaintiff intended to lodge a complaint about what he observed to be reckless, discriminatory, and unconstitutional conduct—

namely, that IndyGo bus drivers were selectively ejecting homeless or disadvantaged-appearing individuals from buses into dangerously cold weather conditions, without due process or equal enforcement. This practice appeared to be applied disproportionately and without any clear policy justification. The bus driver complied with the Plaintiff's request and radioed ahead to notify IndyGo staff that the Plaintiff was seeking to speak with a managerial-level policymaker.

**Physical Assault and Unlawful Detention -** After disembarking from the bus, the Plaintiff proceeded along the main walkway toward the Carson Transit Center building. He was met by two uniformed IndyGo security personnel, later identified as Cletus Jones and John Doe 1. The Plaintiff reiterated that he was requesting to speak with a policymaker or manager—not a shift supervisor or lower-level employee—but a person with authority to address systemic issues. Without warning or provocation, John Doe 1 forcibly grabbed the Plaintiff's right arm, twisted it behind his back, and slammed the Plaintiff face-first into the curbside area covered in road salt. John Doe 1 then immediately placed the Plaintiff in handcuffs. At no point did the Plaintiff exhibit any resistance or pose a threat to safety.

**Passive Non-Resistance in the Face of Unlawful Conduct -** The Plaintiff, who possesses a strong lay understanding of constitutional law, intentionally refrains from resisting when he is unlawfully detained, restrained, or assaulted by government actors. In such situations, he employs a deliberate and consistent practice of going limp—a passive non-resistance strategy sometimes described as "rag dolling." This method reflects the Plaintiff's principled refusal to lend voluntary physical assistance to what he recognizes as illegal or unconstitutional conduct. The Plaintiff believes that engaging or resisting in any way could be construed as consent to, or participation in, unlawful government action. Accordingly, in this instance, the Plaintiff did not

resist or struggle, allowing Cletus Jones and John Doe 1 to continue their unlawful conduct without physical cooperation.

**Further Violations and Warrantless Search -** After unlawfully detaining the Plaintiff, security guards Cletus Jones and John Doe 1 refused to answer whether the Plaintiff was under arrest or to provide any explanation for the use of force against him. Despite the absence of probable cause or any articulable suspicion, they proceeded to search the Plaintiff's pockets without his consent—an unconstitutional action presumptively aimed at finding post hoc justification for their misconduct. See *Terry v. Ohio*, 392 U.S. 1 (1968) (investigative detentions and searches require reasonable suspicion grounded in specific and articulable facts). During this unauthorized detention and battery, the guards also damaged the Plaintiff's laptop computer (see Exhibit 6), which constitutes a Fourth Amendment violation. See *Soldal v. Cook County*, 506 U.S. 56 (1992) (destruction of property by state actors is a "seizure" subject to constitutional limits). After failing to uncover anything incriminating, the guards asked the Plaintiff for his address, to which he truthfully responded that he was homeless. This detail was recorded in the Trespass Warning Form (Exhibit 1), where IndyGo and Cletus Jones officially labeled the Plaintiff "homeless." The guards then summoned the Indianapolis Metropolitan Police Department (IMPD), and while waiting for officers to arrive, continued to mock and humiliate the Plaintiff as he remained unlawfully restrained.

**IMPD and Jane Doe 1's Role -** At or around the time the police arrived, Jane Doe 1, a managerial representative of IndyGo, also appeared on the scene. Upon arrival, the IMPD officers immediately engaged in conversation with Cletus Jones and John Doe 1—the parties responsible for the Plaintiff's unlawful detention—while deliberately avoiding any

communication with the Plaintiff. Jane Doe 1 was observed speaking with both the security guards and the IMPD officers but made no attempt to inquire about the Plaintiff's well-being or hear his account of events. The Plaintiff attempted to inform the officers that he had been unlawfully detained and assaulted, yet his statements were entirely disregarded. At no point did the officers take a formal statement from the Plaintiff. Nor did they advise him of his legal status —whether he was under arrest—or provide any explanation for the force and restraint being applied to him. This institutional refusal to engage with or acknowledge the Plaintiff, while deferring exclusively to the accusing parties, exemplifies a one-sided, constitutionally deficient procedure that deprived the Plaintiff of due process and equal protection under the law.

**Medical Evaluation and Continued Search** - At a later point during the incident, the Plaintiff—still restrained—was dragged by the officers into the center of the Carson Transit Center parking lot and propped against a vehicle. Shortly thereafter, an ambulance and fire department personnel arrived on scene. The responding firemen conducted basic cogency tests, such as asking the Plaintiff the current date and other simple orientation questions, all of which the Plaintiff passed without issue. The Plaintiff declined any medical treatment or procedures offered by the paramedics. After the emergency responders departed, the IMPD officers briefly removed the Plaintiff's handcuffs to take off his backpack, only to immediately reapply them. The officers then proceeded to search the Plaintiff's backpack without a warrant, consent, or probable cause—further extending the pattern of unconstitutional search and seizure that began with the prior warrantless search of his pockets.

**Jail Violations and Inhumane Treatment -** Following the events at the Carson Transit Center, the Plaintiff was forcibly dragged into a police transport vehicle ("paddy wagon") by

IMPD officers, with the involvement of Cletus Jones and John Doe 1. At no point did the officers advise the Plaintiff of his Miranda rights, nor did they provide any explanation for the arrest, despite repeated inquiries. The failure to issue Miranda warnings, while not independently dispositive, forms part of the broader pattern of unconstitutional detainment and deprivation of rights. The Plaintiff was transported to the Marion County Jail without any identifiable contraband, probable cause, or articulable offense, in violation of clearly established Fourth and Fourteenth Amendment protections.

Upon arrival at the jail, the Plaintiff was subjected to a warrantless and nonconsensual blood draw and fingerprinting—an unconstitutional intrusion on his bodily integrity and biometric data. See *Missouri v. McNeely*, 569 U.S. 141 (2013) (warrantless blood draws violate the Fourth Amendment absent exigent circumstances). These actions appear to have been undertaken as part of an effort to retroactively justify an arrest that had no lawful basis. As documented in Exhibit 2 (Officer's Arrest Report), no criminal charge was listed—confirming the absence of any lawful grounds for arrest or detention.

Shortly after intake, jail personnel—under color of law—stripped the Plaintiff completely nude in a violent and degrading manner. He was placed on "suicide watch" despite expressing no suicidal ideation, and was denied access to a telephone or any method of securing bail. He was publicly mocked during this process and held in a brightly lit room overnight alongside other fully naked detainees. This treatment constituted cruel and unusual punishment and serves as evidence of a broader policy or custom within IMPD and the jail system to dehumanize individuals, particularly those perceived as vulnerable or outspoken.

The Plaintiff was released the following day with no charges filed, a Prosecutor Declination of Prosecution (PDP). The sequence of events illustrates a pattern of arbitrary detention, abuse of process, and intentional humiliation designed to deter the Plaintiff—and others—from exercising their constitutional rights.

The Plaintiff's forced nudity, public humiliation, and extended confinement in a brightly lit room without access to communication—while awaiting no charges—constituted unconstitutional punishment, as the treatment served no legitimate penological purpose and appeared intended to degrade and deter protected conduct.

**Facts Underlying the February Incident:**

February 25, 2025 ~6PM - ~10PM

**Location:**

Indanapolis Public Library College Avenue Branch

4180 N College Ave, Indianapolis, IN 46205

and

Intersection of 40th Street and N College Ave.

On February 25, 2025, Plaintiff was patronizing Crab 99 restaurant in downtown Indianapolis during afternoon happy hour. While outside the establishment smoking a cigarette, Plaintiff encountered a visibly distressed woman who identified herself as having recently experienced police misconduct and mistreatment. She appeared angry and emotionally upset.

Moved by her statements, Plaintiff expressed his intention to pursue federal legal action against the Indianapolis Metropolitan Police Department ("IMPD") to challenge what he

described as ongoing patterns of police abuse and constitutional violations. He stated this declaration aloud as the woman departed.

Immediately thereafter, Plaintiff observed three uniformed IMPD officers standing at the nearby street corner. The officers consisted of one white male, one negro male later identified as Officer McBee (among the officers depicted in Exhibit 8), and one white female officer.

Plaintiff approached the officers and asked whether they upheld the Constitution in their interactions with the public. The white male officer replied that they “just follow probable cause,” asserting that “probable cause is all that matters.”

Plaintiff briefly recounted to the officers the January 22–23, 2025 incident in which he had previously been detained. The same white male officer responded, “well, you probably have a case.” The officers then appeared uneasy, and shortly thereafter dispersed from the area without further discussion.

Later that afternoon, between approximately 3:00 p.m. and 5:00 p.m., Plaintiff entered the College Avenue Branch of the Indianapolis Public Library to speak with a security guard with whom he had previously conversed. Upon learning from library staff that the guard was not presently available, Plaintiff departed the library within ten to fifteen minutes.

By coincidence, Plaintiff’s former roommate and her then-boyfriend entered the library shortly after his departure. According to statements later relayed to Plaintiff by his former roommate, she was confronted in the library restroom area by IMPD officers who questioned her in front of her boyfriend. She reported feeling intimidated and frightened by their conduct.

Plaintiff's former roommate stated that after leaving the library, she took a circuitous route back to her residence in an effort to avoid being followed. Nonetheless, IMPD officers allegedly trailed her to that address and remained in the vicinity awaiting Plaintiff's return.

Approximately ten to fifteen minutes later, Plaintiff arrived at the residence. Upon entering, he found his former roommate visibly alarmed. She promptly decided to leave and spend the night at her boyfriend's home.

Within several minutes of her departure, IMPD patrol vehicles arrived outside the residence. Officers activated their lights and loudly called out Plaintiff's first name, "Aaron."

Plaintiff stepped outside and sat on the front steps holding a beer, seeking to speak with the officers. He was confronted by an irate white female officer and an angry male officer who claimed they had received a report from Plaintiff's former roommate stating that she "felt unsafe around him."

Plaintiff denies that any such report was made and asserts that his former roommate explicitly refuted making such a statement. Plaintiff further observed an IMPD patrol vehicle circling the block, apparently continuing to follow his former roommate while positioning itself out of public view.

Plaintiff spoke with the responding IMPD officers for approximately ten to twenty minutes. The officers conducted no lawful arrest and identified no basis for detention or further action. They ultimately departed the scene without incident.

Plaintiff, disturbed and unsettled by this apparent act of intimidation and harassment, retired for the evening in a state of emotional distress.

The following day, Plaintiff contacted his former roommate by telephone to address the officers' stated claim that she had called the police. Plaintiff told her that if she felt unsafe, she could simply refrain from further contact with him rather than involve law enforcement. His former roommate replied that she had made no such call to IMPD and was herself traumatized by the police encounter. She further reported that during the Plaintiff's interaction with the officers, she and her boyfriend were again approached by police while attempting to leave their residence.

Deeply disturbed by these events and perceiving a continuing threat from IMPD personnel, Plaintiff redoubled his efforts researching federal civil procedure to properly develop his civil case against IMPD and their un-Constitutional acts.

On March 8, 2025, motivated by a desire to protect both himself and his former roommate from further unlawful interference, Plaintiff decided to confront IMPD officials directly at the department's downtown headquarters. His purpose was to deliver a professional request that IMPD officers cease their ongoing harassment.

Upon arrival at IMPD headquarters, Plaintiff encountered a uniformed officer seated in a black patrol vehicle who identified himself as a sergeant. Plaintiff requested that the sergeant summon the officers responsible for the prior harassment so that he could issue a formal statement demanding that they desist.

The sergeant responded mockingly, referencing the visible wrist scars left by IMPD handcuffs during the January 22–23, 2025 incident, and dismissively stated, "Oh, they'll fade." Despite this, the sergeant contacted other officers to the scene.

Several IMPD officers subsequently arrived, including Officer McBee (the same negro male officer encountered on February 25), another unidentified negro male officer who behaved aggressively toward Plaintiff, and a white male officer identified as Officer Kaleel.

Officer Kaleel addressed Plaintiff in a mocking and disrespectful tone, repeatedly referring to him by his first name despite Plaintiff's request to be addressed formally as "Mr. Singer." Kaleel appeared to take amusement in the interaction, laughing and speaking loudly in a demeaning manner.

When questioned about the February 25 incident, Officer Kaleel acknowledged the prior police intrusion and vaguely stated that it had been conducted as "a welfare call." When Plaintiff asked what the term "welfare call" meant in that context, the officers refused to provide clarification.

Plaintiff informed the officers directly that their conduct constituted harassment and ordered that such behavior cease immediately. The officers dismissed Plaintiff's statements, displayed visible unease, and quickly departed the scene.

The conduct of IMPD officers during and after the February 25, 2025 incident reflects a deliberate and coordinated pattern of harassment and intimidation directed at Plaintiff in retaliation for his protected speech and his efforts to seek redress for prior constitutional violations. The recurrence of similar misconduct by multiple officers across separate dates and districts, combined with the department's indifference to Plaintiff's direct complaints at IMPD headquarters, demonstrates the existence of an institutional policy, custom, or tolerance of retaliatory behavior toward complainants of police abuse. These coordinated acts further

illustrate a continuing enterprise operating under color of law to obstruct justice, interfere with Plaintiff's civil rights, and deter the exercise of lawful access to the courts.

**Facts Underlying March 9 Incident:**

This occurred a day after speaking to the police officers on March 8 at their headquarters. On March 9, 2025, the Plaintiff—then a member of the Irsay Family YMCA—requested access to the facility's chapel. Staff responded in an erratic and illogical manner, ultimately threatening to ban the Plaintiff from the premises. When the Plaintiff requested a written ban to retrieve his belongings from a locker, YMCA staff instead contacted IMPD. The supervisor made the call in a familiar tone, stating, "Hey Greg, we have someone here," suggesting a personal or habitual relationship with IMPD officers.

Two officers arrived, one identified as McBee (the same McBee from March 8). Although the Plaintiff was present and available, officers declined to hear his side of the story. Instead, they spoke exclusively with YMCA personnel and summarily escorted the Plaintiff out of the building under threat of force.

This event further illustrates the unconstitutional IMPD practice of accepting the narrative of institutions or "preferred persons" without conducting a neutral investigation or affording the accused an opportunity to respond—particularly in nonviolent, ambiguous situations. It exemplifies the systemic denial of due process and reinforces the pattern of behavior alleged in the January, February, and June incidents.

**Facts Underlying the June Incident:**

June 22, 2025 ~6PM with imprisonment lasting into June 26,2025

**Location:**

IFD Station 31

4155 N College Ave, Indianapolis, IN 46205

and

Marion County Jail

675 Justice Way Indianapolis, IN 46203

The Plaintiff incorporates by reference the Notice of Subsequent Related Events ("NSRE") previously filed in this Court, which provides additional factual clarification regarding the June 22–26, 2025 incident. The NSRE, along with the exhibits submitted therewith, establishes the sequence of events surrounding the Plaintiff's unlawful seizure, harassment, and detention during this period. Exhibits previously submitted, including photographic documentation of injuries (Exhibit 14-D), text messages to third parties (Exhibit 14-A), and images of the involved officers (Exhibit 14-B), are integral to understanding the full scope and severity of the Defendant's misconduct. These materials collectively corroborate the Plaintiff's statements of fact, demonstrate the constitutional and statutory violations, and support the claims asserted in this First Amended Complaint. Specific Exhibits that pertain to this incident are previously submitted( Exhibits 9-14).

On June 22, 2025, Plaintiff Aaron Singer boarded a southbound Red Line bus at the 62nd Street and College Avenue station in Indianapolis. During the route, he was physically assaulted by an unknown assailant, who struck him in the face near his left mandible and stole his prescription glasses. The assault left Plaintiff visibly bloodied, disoriented, and likely concussed.

At no time following his subsequent arrest and detention was he provided medical care.

*(See Exhibit 14-A: Text message to father and related correspondence.)*

Plaintiff disembarked at the 42nd Street and College Avenue station and walked to Indianapolis Fire Department Station 31, located nearby, to seek help. Plaintiff informed the fire personnel that he had just been assaulted. Despite visible facial injuries, the firefighters failed to provide medical aid, refused to summon an ambulance, and did not contact law enforcement for assistance. Instead, they mocked and dismissed Plaintiff, referring to him in a derogatory tone. The firefighters were aware that Plaintiff was a federal civil rights litigant against multiple municipal entities, including IMPD, at the time. Recognizing their dereliction of duty, Plaintiff left the station and briefly returned to his residence.

Later that same day, Plaintiff walked north along College Avenue toward a nearby convenience store to purchase medical supplies. As he passed Station 31 for a second time, an IMPD patrol vehicle approached rapidly from behind, maneuvering aggressively and forcing Plaintiff into the fire station's parking lot. Without identifying any crime or articulating reasonable suspicion, two IMPD officers exited their vehicle (**Brendan Houston** and **Alex Woyak)** and began verbally accosting the Plaintiff. Plaintiff managed to photograph the officers moments before they physically assaulted him.

*(See Exhibit 14-B: Photographs of officers before assault.)*

Plaintiff informed the officers that he was currently pursuing federal civil lawsuits against IndyGo, IMPD, and the Marion County Sheriff's Office. Immediately thereafter, the officers became violent—slamming Plaintiff to the ground and handcuffing him so tightly that his wrists

were deeply cut and bruised.

*(See Exhibit 14-C: Photographs of wrist injuries.)*

While Plaintiff remained handcuffed on the pavement, a fire truck returning to Station 31 collided with the improperly parked police cruiser, tearing off its front bumper. When Plaintiff laughed audibly at the incident, the officers intensified their aggression, threatening him further. When asked for the legal basis of his detention, one officer responded simply: “Disorderly Conduct.”

Plaintiff was transported via paddy wagon to the Marion County Jail. There, a short, bearded intake officer physically abused him further, wrenching his shoulders, dragging him across the floor, and inflicting additional bruising.

*(See Exhibit 14-D: Photographs of bruising and physical damage.)*

Plaintiff was initially informed that he was being detained for “Disorderly Conduct – Unreasonable Noise (Class B Misdemeanor)”. Upon arraignment, the charge was unilaterally changed to “Intimidation (Class A Misdemeanor)”, without factual justification or probable cause. At no point during his incarceration was Plaintiff evaluated or treated for his injuries, despite obvious signs of trauma and repeated verbal requests.

Plaintiff remained incarcerated from June 22 to June 26, 2025, during a critical phase of three pending federal civil cases, specifically:

- In his federal civil case against IMPD and related municipal defendants, Plaintiff was awaiting the Defendants’ answer or responsive pleading to his initial complaint as required under Fed. R. Civ. P. 12(a).

- Two days before his arrest, IndyGo had produced limited discovery in *Singer v. IndyGo*, **No. 1:25-cv-00470**.
- It was approximately three weeks after Plaintiff filed *Singer v. Marion County Sheriff's Department*, **No. 1:25-cv-01074**, still awaiting judicial review.

While incarcerated, Plaintiff filed a grievance alleging **Obstruction of Justice**, asserting that his arrest and detention were intended to interfere with and chill his federal civil litigation.

Following his release on June 26, 2025, the Marion Superior Court permitted Plaintiff to leave the state for his safety. Plaintiff immediately closed his Indianapolis P.O. Box and relocated temporarily to a separate state with the assistance of his father, who had taken leave from work to ensure his protection. After several days of recovery, Plaintiff resumed his legal work across his active federal cases.

The State of Indiana v. Aaron Singer, **Case No. 49D26-2506-CM-019365**, was ultimately dismissed by the Marion Superior Court on grounds consistent with Indiana Rule of Criminal Procedure 4(C) and Indiana Code § 35-34-1-4(a)(11)—*failure to prosecute / improper charge*. The dismissal was effectively one "with prejudice", as the prosecution declined and was procedurally barred from re-filing.

The State's main witness was excluded from testimony and refused to appear for two properly noticed depositions. The IMPD officer who testified at trial (Houston) was not a witness to any alleged offense and presented nothing but inadmissible hearsay, which the court disregarded.

The IMPD officers had no probable cause or lawful basis for arresting Mr. Singer. The alleged "intimidation" charge arose only after the officers entrapped Mr. Singer by forcing him onto Station 31 property, thus manufacturing the pretext for criminal proceedings. The prosecution's reliance on these fabricated and hearsay-based allegations led directly to dismissal, confirming the retaliatory and unconstitutional nature of the arrest.

**Plaintiff's Background and Good Standing**

- Plaintiff Aaron Singer is a law-abiding adult previously residing in Indianapolis, Indiana.
- Plaintiff has no criminal record and has never previously been arrested, charged, or convicted by any law enforcement agency in Marion County or elsewhere in the United States.
- Plaintiff has had no substantive interactions with the Indianapolis Metropolitan Police Department prior to the incidents described herein.
- Plaintiff has resided in Indianapolis for multiple years without incident, demonstrating consistent compliance with all municipal, state, and federal laws.
- Over the course of the incidents described in this Complaint, Plaintiff was forced to interact with sixteen (16) unique IMPD officers between January 22 and June 26, 2025.
- During his January 22–23, 2025 incarceration, Plaintiff was subjected to interactions with seventeen (17) deputies/officials from the Marion County Sheriff's Department; during the June 22–26, 2025 incarceration, he was forced to interact with at least five (5) deputies.

- Plaintiff's clean legal record, law-abiding history, and the extraordinary number of law enforcement personnel involved highlight that the conduct described above was unprovoked, retaliatory, and contrary to the rights guaranteed under the U.S. Constitution.

**LEGAL ANALYSIS**

**Monell Liability Analysis -**

**Unconstitutional IMPD Custom or Policy:** The Plaintiff alleges that IMPD maintains and enforces a custom or informal policy that predictably results in constitutional rights violations (*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). The custom operates as follows:

1. **Institutional Deference:** Certain institutions or "preferred individuals"—such as security staff or managers from local organizations—are granted informal authority to initiate police response for virtually any alleged offense, regardless of factual support.
2. **Delegated Use of Force:** In cases involving institutions with in-house security, IMPD permits or tacitly condones the violent detention of individuals by non-police personnel, even when those individuals are peacefully exercising constitutional rights, such as the First Amendment right to petition government officials. (See Exhibit 1)
3. **Post-Hoc Justification of Detentions:** IMPD accepts and enables the practice of unlawful searches conducted after the fact of detention, with the aim of discovering retroactive justification for the seizure. (See Exhibit 7)

4. **Custodial Transfer Without Probable Cause:** IMPD routinely takes custody of detainees from such institutions or "preferred persons" without verifying probable cause, and without independently investigating the allegations or taking a statement from the detainee. (See Exhibit 2)

5. **One-Sided Investigation:** Upon arrival, IMPD officers interact only with the calling party and intentionally disregard or refuse to document the account of the person being detained. This selective process functions as an automatic endorsement of the complainant's narrative, regardless of its merit. (See Exhibit 6)

6. **Escalation Through Coercive Force:** IMPD officers escalate these encounters through formal arrest, transportation under threat of deadly force, and coordination with jail personnel to conduct invasive biological searches (blood draws, fingerprinting), biometric data collection, and dehumanizing treatment—including forced nudity, extended exposure to bright lights, and verbal mockery—all of which appear designed to provoke or humiliate the detainee into unlawful conduct, thereby justifying the arrest retroactively. (See Exhibit 3)

7. **Chilling Effect on Constitutional Accountability:** In rare cases where no crime is committed and no contraband is discovered, IMPD and institutional actors rely on the likelihood that victims lack legal knowledge, time, or resources to pursue redress, allowing unconstitutional acts to go unchallenged. (See Exhibit 8)

This policy is dangerous, systemic, and plainly unconstitutional. It converts the police force into an enforcement tool for private actors and undermines fundamental Fourth and Fourteenth Amendment protections. It also discourages the lawful exercise of First Amendment rights by creating an environment of fear and retaliation for those who question institutional misconduct.

This policy is mirrored not just in the initial incident that occurred in January, but was demonstrated again in the March 9 and June 22-26 incidents. The June incident being more extreme as the IMPD officer intentionally forced the Plaintiff onto the fire department property in order to justify their illegal actions, and they were fully aware of the Plaintiff's status as a federal witness.

The Plaintiff incorporates by reference Exhibits 18 and 19, the U.S. Department of Justice reports on the Louisville Metro Police Department and the Phoenix Police Department, respectively. These reports document systemic patterns of constitutional violations, including unlawful stops, excessive use of force, failure to supervise officers, and inadequate accountability mechanisms. The findings demonstrate that municipal police departments, when operating without robust oversight and accountability, repeatedly engage in practices that violate citizens' constitutional rights. IMPD's actions in the present case mirror these documented systemic failures, including the repeated unlawful seizures, harassment, and obstruction of justice experienced by the Plaintiff. These parallels support the Monell claim by illustrating that IMPD's misconduct was not merely isolated acts by individual officers, but rather the predictable outcome of institutional customs, policies, and failures to train, supervise, or discipline officers properly.

**Conspiracy to Commit Unconstitutional Abuse in Jail Intake Process:** The plaintiff alleges that IMPD officers were fully aware of the unlawful, dehumanizing, and punitive intake practices at the Marion County Jail, and conspired to subject the plaintiff to them as part of an unofficial but well-known pattern of conduct. After unlawfully detaining and transporting the plaintiff without cause, IMPD officers knowingly delivered him to a facility where it is routine to forcibly strip detainees, expose them to prolonged public nudity, and deny them basic dignity and due process protections.

The plaintiff was immediately stripped fully naked by jailers, told he was being placed on suicide watch without psychological evaluation, and confined without access to a phone or the ability to secure release. He was mocked by jail staff, left exposed in a brightly lit room overnight with other nude men, and deprived of sleep and privacy. The plaintiff's nudity was both witnessed and recorded by jail staff, and one deputy made sexually charged comments to the plaintiff during the process. The officers' knowledge of and cooperation with jail intake practices underscores IMPD's de facto policy of extrajudicial punishment by proxy. The IMPD officers' knowing participation and deliberate handoff to jail personnel for this unconstitutional treatment constitutes a conspiracy to violate the plaintiff's rights under the Fourth and Fourteenth Amendments.

This is reflected again in the June 22-26 incident, where IMPD officers intentionally delivered the Plaintiff to the Marion County Jail where he was subjected to violence by the Sheriff's deputy at intake (wrenching and damaging of his shoulders, dragging along the filthy ground in the jail, further cuts and damage to his wrists from the aggressive application of handcuffs).

**Delegation of Arrest Authority and Identification Issues** – The Plaintiff was not provided with a properly signed arrest report by any of the four IMPD officers present (E125, E124, E190, and E290). Instead, the only listed "arresting officer" in the Call for Service (CAD) report is "207 from Jonesborough," later identified as Cletus Jones, an IndyGo security officer and not a sworn IMPD officer. The failure of the actual arresting IMPD officers to sign or otherwise take formal responsibility for the arrest raises serious concerns regarding accountability and adherence to department protocols. The Plaintiff later identified the involved IMPD officers through a public records request. The delegation of arrest authority to a non-police security guard, followed by the refusal of any officer to sign the arrest paperwork, supports Plaintiff's claim that this incident was carried out under an informal and unlawful policy or custom of bypassing constitutional safeguards.

Upon initial disclosures by IMPD (a police version of the "public report" exhibit 7) IMPD had no grounds for arrest at all during the January incident, relying on the word of an off duty, out of jurisdiction police officer (Cletus Jones from Jonesboro). They stated the following: "OUR IMPD WAGON THEN TRANSPORTED THE PRISONER TO THE MARION CO. ADULT INTAKE CENTER. OFFICER JONES WILL BE SUBMITTING HIS PROBABLE CAUSE AFFIDAVIT TO THE MARION CO. PROSECUTORS OFFICE." None of which materialized as all "probable cause" was fabricated by IndyGo security.

**State-Law Claims**

- Battery – **Ind. Code § 35-42-2-1** (Level 5 Felony – Use of Deadly Force)

- **Statutory Basis:**

  Under Indiana Code § 35-42-2-1, a person commits *Battery* when they knowingly or intentionally touch another person in a rude, insolent, or angry manner, resulting in bodily injury. The offense is elevated when committed by a public servant acting under color of law, and further enhanced to a Level 5 Felony when the conduct involves the use or threat of deadly force.

- **Synopsis of Violation:**

  Plaintiff was subjected to repeated acts of physical violence by law enforcement personnel acting under color of law. On both **January 22–23** and **June 22–26**, IMPD officers and coordinated municipal agents—including IndyGo security and jail deputies—used excessive and unjustified physical force upon a restrained and non-threatening individual.

  During both incidents, Plaintiff was handcuffed, dragged, and thrown to the pavement, sustaining deep lacerations and bruising. While in jail, intake officers inflicted further harm by wrenching his shoulders and dragging him while shackled. The repeated infliction of physical injury in the absence of any lawful basis constitutes *Battery* under Indiana law, aggravated by the coercive authority of the perpetrators and their coordinated use of official power.

- Kidnapping **– Ind. Code § 35-42-3-2** (Level 3 Felony – Use of Deadly Force)

  - **Statutory Basis:**

    Under Indiana Code § 35-42-3-2, *Kidnapping* occurs when a person knowingly or intentionally removes or confines another person by fraud, enticement,

force, or threat of force without consent or lawful authority. The offense escalates to a Level 3 Felony when deadly force or the threat thereof is employed.

- **Synopsis of Violation:**

  Plaintiff was twice unlawfully seized and transported against his will—first from the Carson Transit Center (January incident), and later from Fire Station 31 (June incident)—without probable cause, warrant, or judicial authorization.

  In both incidents, IMPD officers brandished lethal weapons and exercised coercive physical control to forcefully remove the Plaintiff from public property, handcuff him, and transport him to the Marion County Jail. The seizures were not incident to any lawful arrest and were executed for the purpose of intimidation, punishment, and interference with ongoing civil litigation. These acts, undertaken under color of law and through threat of deadly force, constitute *Kidnapping* as defined by Indiana Code § 35-42-3-2.

- False Imprisonment (Criminal Confinement) – **Ind. Code § 35-42-3-3** (Level 3 Felony – Use of Deadly Force)

  - **Statutory Basis:**

    Indiana Code § 35-42-3-3 prohibits knowingly or intentionally confining or restraining another person without consent and without lawful authority. The offense is elevated when the restraint involves the use or threat of deadly force or results in bodily injury.

- **Synopsis of Violation:**

In both the January and June incidents, Plaintiff was unlawfully detained and confined by IMPD officers without probable cause or articulable suspicion of any offense. After being handcuffed and forcibly transported, Plaintiff was subjected to jail intake and prolonged confinement despite the absence of any lawful warrant or charge.

These acts—executed under color of law and through coercion, physical force, and the threat of deadly force—constitute *False Imprisonment* and *Criminal Confinement*. The confinement served no legitimate public purpose and was instead a retaliatory measure designed to punish and silence the Plaintiff for his protected activity in federal court.

- Conspiracy to Commit Sexual Battery – **Ind. Code § 35-42-4-8**, § 35-41-5-2** (Level 4 Felony)

- **Statutory Basis:**

Under Indiana Code § 35-42-4-8, *Sexual Battery* occurs when a person, through coercion or abuse of authority, compels another to submit to a humiliating or sexually invasive act. Under § 35-41-5-2, a person who agrees with another to commit a felony, and performs an overt act in furtherance of the agreement, commits *Conspiracy.*

- **Synopsis of Violation:**

IMPD officers knowingly delivered Plaintiff into the Marion County Jail intake process with the expectation and awareness that he would be subjected to

forced nudity, strip-search, and invasive body inspections under punitive conditions. This was not incidental to legitimate booking but a coordinated act of humiliation intended to degrade and retaliate against the Plaintiff.

During intake, a jail deputy made sexually inappropriate comments, further demonstrating the atmosphere of degradation and abuse. The deliberate transfer of Plaintiff to this known environment—under color of law and without legal cause—constitutes *Conspiracy to Commit Sexual Battery*, as the officers jointly facilitated an unlawful, coercive, and sexually exploitative procedure.

- Official Misconduct – **Ind. Code § 35-44.1-1-1** (Level 6 Felony)
  - **Statutory Basis:**

    Indiana Code § 35-44.1-1-1 criminalizes the knowing or intentional performance of an act by a public servant that is unlawful, or the knowing omission of a duty imposed by law. When committed under color of official authority, such acts constitute *Official Misconduct*, a Level 6 Felony.
  - **Synopsis of Violation:**

    IMPD officers repeatedly engaged in unlawful acts and omissions while performing their official duties:
    - **January incident:** Officers refused to identify themselves, falsified the arrest record by attributing the arrest to a private IndyGo security guard, and disregarded statutory arrest and reporting procedures.

- **June incident:** Officers fabricated probable cause, forcibly maneuvered Plaintiff onto fire department property to manufacture jurisdiction, and executed an unlawful arrest in retaliation for Plaintiff's ongoing federal litigation.

Each of these acts represents a conscious deviation from lawful authority and the duties imposed upon sworn officers, constituting *Official Misconduct* under Indiana Code § 35-44.1-1-1.

- Harassment – **Ind. Code § 35-45-2-2** (Level 6 Felony)
  - **Statutory Basis:**

    Under Indiana Code § 35-45-2-2, a person commits *Harassment* when, with intent to harass, annoy, or alarm another person (and without legitimate purpose), they engage in repeated or continuing conduct that serves no lawful purpose and causes emotional distress to the victim. It can be elevated to a Level 6 Felony when committed by a public servant under color of law or through misuse of official authority.

  - **Synopsis of Violation:**

    IMPD officers engaged in a sustained course of conduct intended to harass, intimidate, and silence the Plaintiff for his active participation in federal civil rights litigation against municipal entities. On June 22, 2025, after the Plaintiff had already been physically assaulted and visibly injured, officers deliberately forced him onto fire department property without probable cause, verbally taunted him, and used excessive force while he was handcuffed and non-resistant.

Their actions were not based on any legitimate law enforcement purpose, as no crime had been committed nor any reasonable suspicion articulated. The officers' statements and conduct—including mockery and escalating violence in direct response to his mention of pending federal lawsuits—demonstrate intent to cause emotional and psychological distress rather than to maintain public order.

This incident, when considered alongside prior police interactions between January 22 and June 26 (approximately 16 unique IMPD officers), shows a pattern of unlawful harassment motivated by animus toward the Plaintiff's protected activity and speech under 42 U.S.C. § 1983.

- Obstruction of Justice **– 18 U.S.C. § 1512 and/or Ind. Code § 35-44.1-2-2** (Level 6 Felony)

  - **Statutory Basis:**

    Both the federal statute and Indiana Code § 35-44.1-2-2 criminalize knowingly or intentionally interfering with, impeding, or influencing an official proceeding, investigation, or witness through intimidation, coercion, or physical force. The offense includes any attempt to hinder the reporting or prosecution of a crime or to retaliate against a person for participation in an official proceeding.

  - **Synopsis of Violation:**

    IMPD officers' actions on June 22–26 constitute *Obstruction of Justice* because they directly interfered with the Plaintiff's status and activity as a federal civil litigant and witness in active § 1983 actions.

- Officers deliberately forced the Plaintiff onto Station 31 fire department property to fabricate a pretext for arrest.
- They used unlawful detention and violence to suppress his ability to continue pursuing federal litigation, knowing he was a party and witness in multiple pending federal civil rights cases.
- The resulting criminal charge—ultimately dismissed for improper filing and charging—was used as a tool to delay and derail federal discovery deadlines, constituting a corrupt interference with judicial process under both federal and state definitions of obstruction.
- During incarceration, officials ignored his injuries, denied medical care, and prevented timely legal filings, further obstructing access to the courts and continuation of ongoing federal litigation.

The deliberate initiation of baseless criminal proceedings by IMPD, particularly timed around critical discovery and response deadlines, demonstrates a coordinated intent to *impede the administration of justice* and to retaliate against Plaintiff for engaging in constitutionally protected legal activity.

**Constitutional Violations:**

**Fourth Amendment – Unreasonable Seizure and Search**

Defendants, acting under color of state law, repeatedly subjected Plaintiff to unreasonable seizures and searches in violation of the Fourth Amendment to the United States Constitution.

- Unlawful Seizures:

  Plaintiff was physically seized on both January 22–23, 2025 and June 22, 2025 without probable cause, warrant, or articulable suspicion of any crime. In each instance, IMPD officers unlawfully restrained, handcuffed, and transported Plaintiff against his will.

  - June 22, 2025 Incident:

    Officers intentionally forced Plaintiff onto Fire Station 31 property—outside of their lawful jurisdiction—as a pretext for arrest. The officers provided no basis for their actions and fabricated a probable cause narrative to justify detention.

  - February 25, 2025 Harassment:

    Plaintiff was approached and questioned for 10–20 minutes by multiple IMPD officers who conceded they had no reason to arrest him, confirming the lack of probable cause and the ongoing pattern of unconstitutional interference.

- Unlawful Searches:

  Defendants conducted multiple unlawful searches of Plaintiff's person and property, including pockets, backpack, biometric (fingerprint) data, and compelled medical testing (blood draw), all without consent, warrant, or legal justification.

- Jail Intake Violations:

  During both the January and June incarcerations, jail personnel—acting in coordination with IMPD—subjected Plaintiff to excessive, invasive, and punitive bodily searches inconsistent with legitimate security needs.

These seizures and searches, executed without legal justification and in deliberate disregard of constitutional protections, constitute clear violations of the Fourth Amendment.

**Fourteenth Amendment – Due Process and Equal Protection**

Defendants deprived Plaintiff of liberty and equal protection of the laws through arbitrary enforcement, retaliatory detention, and systemic disregard for procedural fairness.

- Denial of Due Process:
  At no point was Plaintiff informed of the legal basis for his detention or provided Miranda warnings. Officers failed to take Plaintiff's statement, denying him any opportunity to contest accusations before being confined.

- Fabrication and Abuse:
  In the June incident, officers manufactured probable cause by coercively maneuvering Plaintiff onto fire department property, then claimed jurisdiction to justify arrest. Such conduct constitutes both procedural and substantive due process violations.

- Institutional Bias and Custom:
  IMPD officers' refusal to consider Plaintiff's side of events reflects a *de facto* municipal policy and custom of favoring institutional complainants or "preferred persons" (such as IndyGo or city agencies) while dismissing individual citizen grievances.

- Degrading and Inhumane Treatment:
  Plaintiff was subjected to public humiliation and forced nudity during jail intake, mocked by officers and deputies, and denied medical evaluation for visible injuries sustained during arrest.

- Pattern of Arbitrary Enforcement:

  The arbitrary shift of charges—from *Disorderly Conduct (Class B Misdemeanor)* to *Intimidation (Class A Misdemeanor)*—without any supporting evidence underscores the absence of procedural integrity.

Collectively, these acts demonstrate deliberate indifference to Plaintiff's constitutional rights and an entrenched institutional bias, violating both the *Due Process* and *Equal Protection* Clauses of the Fourteenth Amendment.

**First Amendment – Retaliation**

Defendants unlawfully retaliated against Plaintiff for engaging in protected First Amendment activity, including petitioning government officials and filing civil rights complaints.

- Initial Retaliation (January Incident):

  Plaintiff's first unlawful detention followed his attempt to file a formal complaint regarding IndyGo misconduct—core petitioning activity protected by the First Amendment.

- Continuing Harassment (February 25, 2025 and March 8, 2025):

  When Plaintiff attempted to assert his rights and request that IMPD cease its harassment, officers mocked, dismissed, and threatened him, chilling his continued exercise of free speech and petition rights.

- Escalated Retaliation (June 22–26, 2025):

  The June arrest and detention occurred during the pendency of Plaintiff's active federal

lawsuits against IMPD, IndyGo, and the Marion County Sheriff's Department. The timing, absence of probable cause, and severity of treatment demonstrate a deliberate effort to intimidate Plaintiff, obstruct ongoing litigation, and suppress protected speech.

The cumulative pattern of retaliation—initiated in response to Plaintiff's constitutionally protected legal actions—constitutes a direct violation of the First Amendment's protections of free expression, petition, and redress of grievances.

**Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 Analysis**

The **Racketeer Influenced and Corrupt Organizations Act (RICO)**, codified at **18 U.S.C. §§ 1961–1968**, was enacted to combat organized patterns of criminal conduct by enabling both criminal prosecution and civil remedies against individuals or entities engaging in systematic racketeering activity. Under **18 U.S.C. § 1964(c)**, a private plaintiff may bring a civil action for treble damages and costs against any person or entity that violates **18 U.S.C. § 1962**, provided that the injury resulted from conduct constituting a "pattern of racketeering activity" connected to an "enterprise."

To successfully plead and establish a civil RICO claim, a plaintiff must demonstrate the following critical elements:

1. **Existence of an Enterprise –** an ongoing organization, formal or informal, through which the defendants function as a continuing unit (18 U.S.C. § 1961(4));
2. **Engagement in Interstate Commerce –** the enterprise must affect interstate commerce, directly or indirectly;

3. **Pattern of Racketeering Activity –** at least **two predicate acts** of racketeering within a ten-year period, as defined under **18 U.S.C. § 1961(1)**, which includes acts such as obstruction of justice, kidnapping, extortion, and related offenses;
4. **Operation or Management of the Enterprise –** the defendant(s) must participate, directly or indirectly, in the conduct of the enterprise's affairs through racketeering activity, as described under **18 U.S.C. § 1962(c)**; and
5. **Causation and Injury –** the plaintiff must show that they were injured in their business or property "by reason of" the RICO violation (**18 U.S.C. § 1964(c)**), meaning that the racketeering conduct was both the factual and proximate cause of the harm.

RICO's broad reach permits its application to both private and governmental entities where a coordinated pattern of unlawful acts—executed under the color of authority or institutional cover—results in deprivation of constitutional or statutory rights. When public officials use the machinery of state power to facilitate, conceal, or perpetuate systemic violations of law for organizational benefit, their actions fall squarely within the statute's remedial scope.

**Pattern of Racketeering Activity – Predicate Acts Under 18 U.S.C. § 1961(1)**

Pursuant to **18 U.S.C. § 1961(1)**, a "pattern of racketeering activity" requires the commission of at least two predicate criminal acts within a ten-year period that are related and demonstrate the threat of continued unlawful conduct. The actions undertaken by officers of the Indianapolis Metropolitan Police Department ("IMPD") in both the **January 22–23, 2025** and **June 22–26, 2025** incidents satisfy this standard through distinct but interrelated violations of federal and state law, each constituting a predicate act under the RICO statute.

**Predicate Act One – January 22–23, 2025: Kidnapping and Deprivation of Rights Under Color of Law (18 U.S.C. § 1201 and § 242)**

On **January 22, 2025**, Plaintiff was forcibly seized at the Carson Transit Center by IMPD Officers **E125, E124, E190, and E290**, acting in concert with IndyGo security personnel. Without probable cause, warrant, or lawful authority, Plaintiff was **handcuffed, removed from the public premises, and transported to the Marion County Jail**, where he was subjected to forced biometric collection, strip-search procedures, and confinement—all under threat of deadly force.

This conduct constitutes **kidnapping under 18 U.S.C. § 1201** and **deprivation of rights under color of law under 18 U.S.C. § 242**. The elements of kidnapping are met where an individual is (1) unlawfully seized or confined, (2) transported, (3) against their will, and (4) by means of force or threat of force. Here, the seizure was both **extra-jurisdictional** and **unsupported by probable cause**, making it a textbook example of kidnapping committed under the guise of state authority.

Further, under **§ 242**, the defendants, acting as agents of the City of Indianapolis, **willfully deprived the Plaintiff of his Fourth and Fourteenth Amendment rights** by effectuating an unreasonable seizure and denying due process of law. The calculated and cooperative nature of the seizure, and the subsequent concealment of officer identities within arrest paperwork, reflect a **coordinated enterprise behavior** directed toward intimidation, humiliation, and silencing of the Plaintiff's protected activities.

**Predicate Act Two – June 22–26, 2025: Obstruction of Justice and Witness Retaliation (18 U.S.C. § 1512 and Ind. Code § 35-44.1-2-2)**

On **June 22, 2025**, Plaintiff was again unlawfully detained—this time at **Indianapolis Fire Station 31**, in a joint action between IMPD and IFD personnel. At the time of this seizure, the Plaintiff was a known **federal civil rights litigant and witness** in ongoing § 1983 proceedings against IMPD and the City of Indianapolis. Despite this, IMPD officers engaged in overt acts designed to **intimidate, discredit, and obstruct** Plaintiff's ability to continue his legal proceedings.

The officers' actions—including fabricating pretextual cause, falsifying statements, and coordinating Plaintiff's transfer to the Marion County Jail—constitute **obstruction of justice** under **18 U.S.C. § 1512(b)(1)** (intimidating or corruptly persuading another person to influence or prevent testimony or legal process). The officers knowingly interfered with the Plaintiff's ongoing federal case by orchestrating a situation calculated to **remove him from public access, legal communication, and evidentiary control**, directly impeding the administration of justice.

Further, their conduct violates **Indiana Code § 35-44.1-2-2**, which criminalizes obstruction of legal proceedings and the knowing destruction or concealment of evidence. By attempting to suppress Plaintiff's litigation activity through unlawful arrest and confinement timed precisely to coincide with discovery deadlines, the Defendants engaged in **racketeering conduct intended to derail a federal proceeding**, thereby satisfying the continuity and relatedness prongs of RICO.

**Continuity and Relatedness**

Both predicate acts—**(1) kidnapping and deprivation of rights under color of law, and (2) obstruction of justice and witness retaliation**—are **related in method, purpose, and participants**. Each incident was executed by IMPD personnel under color of municipal authority, each advanced the same organizational objective (to suppress Plaintiff's legal and constitutional activity), and each inflicted quantifiable harm upon Plaintiff's liberty and property interests.

Taken together, these acts form a **pattern of racketeering activity** within the meaning of **18 U.S.C. § 1961(5)**, demonstrating not isolated misconduct but a **continuing scheme** of municipal racketeering through systemic abuse of law enforcement powers.

**RICO Enterprise – 18 U.S.C. § 1961(4)**

An "enterprise" under **18 U.S.C. § 1961(4)** includes any individual, partnership, corporation, association, or other legal entity, as well as any group of individuals associated in fact although not a legal entity. The statute requires proof that the defendants operated or managed such an enterprise through a pattern of racketeering activity.

The facts of this case demonstrate that **the Indianapolis Metropolitan Police Department (IMPD), in concert with the Office of Corporation Counsel (OCC), the Marion County Sheriff's Department (MCSD), and associated city contractors (including IndyGo and IFD personnel)**, collectively form an **association-in-fact enterprise** within the meaning of the statute. This enterprise is defined by a shared organizational purpose, structural hierarchy,

and continuity of operation—all directed toward maintaining institutional dominance through unlawful means and the suppression of constitutional accountability.

**1. Structure and Composition of the Enterprise**

The enterprise operates through multiple interconnected municipal entities:

- **Primary Entity:** *Indianapolis Metropolitan Police Department (IMPD)* – executing the physical component of the unlawful acts (unreasonable seizures, false arrests, excessive force, fabrication of probable cause).
- **Legal Reinforcement:** *Office of Corporation Counsel (OCC)* – providing post hoc legal cover by obstructing discovery, concealing evidence, and issuing blanket denials to judicial inquiries.
- **Custodial Enforcement Arm:** *Marion County Sheriff's Department (MCSD)* – receiving unlawfully detained individuals into custody without proper warrant or probable cause, and subjecting them to unconstitutional intake practices.
- **Auxiliary Participants:** *Indianapolis Fire Department (IFD) and IndyGo Security* – functioning as external collaborators who lend jurisdictional cover and assist in pretextual detentions.

These entities, though nominally independent, act **in concert** and **under mutual understanding** to achieve coordinated objectives: (1) suppress civil rights claims against the City, (2) conceal unlawful police conduct, and (3) protect the institutional image of Indianapolis's municipal apparatus. The collaboration between these actors constitutes a **continuing organizational framework** with division of roles, internal coordination, and

identifiable purpose—satisfying the legal test for an *association-in-fact* enterprise as recognized in *Boyle v. United States*, 556 U.S. 938 (2009).

**2. Common Purpose and Functional Integration**

The enterprise's **common purpose** is to maintain systemic impunity for official misconduct through coordinated abuses of power. Each member agency contributes distinct functions:

- IMPD initiates unlawful arrests and fabricates records.
- OCC manipulates the judicial process by obstructing discovery, filing misleading pleadings, and concealing material evidence.
- MCSD enforces confinement procedures that humiliate, degrade, and suppress victims' will to pursue claims.
- IndyGo and IFD serve as civilian intermediaries that provide pretext for intervention and "cover" for unconstitutional seizures.

Together, these agencies exhibit **functional integration**—a seamless transfer of custody, authority, and responsibility designed to present the appearance of lawful process while concealing the underlying pattern of racketeering conduct.

**3. Continuity of Operation**

The enterprise has demonstrated **continuity** in both structure and objective over time.

- The **January 22–23, 2025** incident initiated the pattern of kidnapping and unlawful detention, where Plaintiff was deprived of liberty and subjected to forced intake.

- The **June 22–26, 2025** incident replicated this structure with new participants, showing that the enterprise's conduct was **not isolated**, but rather a **standardized method** for dealing with "problem individuals" who challenge municipal actors.
- The **post-incident litigation behavior**—including belated disclosures, false certifications, and refusal to engage in discovery—constitutes a *continuing act* of racketeering intended to obstruct justice and conceal the enterprise's illegal actions.

This continuity fulfills the RICO requirement for a **long-term organizational threat**, as defined by *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989).

**4. Operation and Management**

The defendants, including named IMPD officers **E125, E124, E190, and E290**, participated in the **operation and management** of the enterprise by performing acts that furthered its objectives—namely, the suppression of civil rights through unlawful arrests, falsification of official reports, and coordinated obstruction of justice. Supervisory officials and city attorneys acted in **managerial capacity** by ratifying these acts, refusing to discipline the involved officers, and perpetuating the underlying unconstitutional policies.

This satisfies the *Reves v. Ernst & Young*, 507 U.S. 170 (1993) "operation or management" test, as each actor contributed to directing or controlling the enterprise's affairs, whether through administrative action, legal manipulation, or physical enforcement.

**5. Enterprise Liability under § 1962(c)**

Under **18 U.S.C. § 1962(c)**, it is unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to conduct or participate in the enterprise's affairs

through a pattern of racketeering activity. The IMPD enterprise operates in a manner that substantially affects **interstate commerce**, thereby satisfying the jurisdictional element required under **18 U.S.C. §§ 1961–1964**. Specifically:

- **Federal Grants and Funding:** IMPD receives substantial financial support from the federal government in the form of grants, training funds, and equipment subsidies. These funds are derived from interstate sources and facilitate law enforcement operations, creating a direct federal nexus.

- **Interstate Contractors and Surveillance Services:** IMPD routinely engages private contractors and surveillance service providers located in other states to support policing operations, technology acquisition, and investigative services. The use of such out-of-state services further establishes that the enterprise's activities extend beyond state boundaries.

Accordingly, the defendants are jointly and severally liable for damages under **18 U.S.C. § 1964(c)**, including treble damages and attorney's fees.

## Causation and Damages – 18 U.S.C. § 1964(c)

Under **18 U.S.C. § 1964(c)**, any person injured in their business or property by reason of a violation of **18 U.S.C. § 1962** may sue in federal court and recover *threefold* the damages sustained, together with costs and reasonable attorney's fees. The statute thus requires proof of (1) injury, (2) causation, and (3) quantifiable loss stemming from the pattern of racketeering activity.

In the present case, the Plaintiff's injuries arise directly and proximately from the **enterprise's racketeering conduct**, which includes kidnapping under color of law, obstruction of justice, falsification of records, and deprivation of constitutional rights in violation of **18 U.S.C. § 242** and related predicate acts. These violations produced both tangible and intangible harm, encompassing two interrelated categories of damages: (1) *Personal and Reputational Damages* and (2) *Sovereign and Franchise Damages to the United States and State of Indiana.*

**1. Personal and Reputational Damages**

The Plaintiff, a private citizen of good legal standing with no prior criminal record, sustained measurable harm to his **reputation, livelihood, and personal liberty** as a direct consequence of the enterprise's coordinated misconduct.

- Plaintiff was unlawfully arrested, publicly humiliated, and confined on two separate occasions (January 22–23, 2025, and June 22–26, 2025) without probable cause.
- Each detention was publicly recorded, generating permanent reputational damage in both digital and institutional records.
- Plaintiff was forced to defend himself in criminal proceedings and relocate across state lines for his safety, incurring substantial financial costs including transportation, housing, and loss of professional opportunity.
- Plaintiff's physical injuries—including concussion, bruising, and wrist lacerations—required medical attention that was deliberately withheld, resulting in pain, suffering, and prolonged physical distress.

- The Plaintiff continues to bear the stigma and psychological trauma associated with state-sponsored defamation, false criminal charges, and systemic abuse by government agents acting under color of law.

These harms constitute compensable injuries to "business or property" within the meaning of § 1964(c), as federal courts have held that deprivation of lawful occupation, personal liberty, and reputation through official corruption satisfies the statutory requirement when the conduct interferes with the victim's economic and civil capacity.
(*See Diaz v. Gates*, 420 F.3d 897, 900–904 (9th Cir. 2005) (en banc) — recognizing injury to employment prospects from false imprisonment as RICO injury).

**2. Sovereign and Franchise Damages**

Beyond the individual harms, the conduct of the enterprise inflicted broader **franchise-level damage** upon the sovereignty and integrity of the **United States** and the **State of Indiana**, whose delegated powers were perverted by municipal actors in violation of their oaths and statutory duties.

The Plaintiff, as a **citizen and franchisee of the United States**, holds a vested interest in the preservation of the constitutional order. When municipal agents—sworn to uphold that order—convert their offices into instruments of extortion, retaliation, and civilian oppression, the damage transcends personal injury. It constitutes a **fracture of the sovereign franchise** itself: an injury to the republic's foundational compact that guarantees equal protection, due process, and honest governance.

The following consequences demonstrate such sovereign injury:

- The **color of law violations** under 18 U.S.C. § 242 represent direct affronts to the U.S. Constitution, damaging the legal franchise of all citizens by rendering constitutional rights selectively unenforceable.

- The **obstruction of federal court proceedings** (through falsified records, delayed disclosures, and interference with litigation) weakens the supremacy of the federal judiciary and injures the sovereign prerogative of the United States to administer justice impartially.

- The **participation of state and municipal employees** in these actions undermines the sovereignty of the State of Indiana, which derives its authority from the same constitutional franchise.

- Each act of official misconduct under this enterprise thus erodes public trust, diminishes the value of citizenship, and injures the Plaintiff's lawful standing as a constituent member of both the state and federal sovereigns.

Accordingly, Plaintiff asserts that these harms are cognizable under § 1964(c) as derivative injuries to "business or property" in his capacity as a U.S. franchisee—representing a unique but logical extension of RICO's protective scope, where corruption of the civil service inflicts direct damage upon the citizen's franchise interest.

**3. Quantification and Treble Damages**

Applying the **Monell-based damages framework** established in the Relief Requested section, Plaintiff's total baseline damages—covering physical injury, reputational loss, financial

displacement, emotional distress, and deprivation of constitutional franchise—amount to **$29,900,000.00**.

Under the **treble damages provision** of **18 U.S.C. § 1964(c)**, this sum is subject to multiplication by three, yielding a total claim of **$89,700,000.00**, exclusive of attorney's fees and costs. This enhanced remedy reflects Congress's explicit intent to deter and punish systemic corruption by governmental and quasi-governmental enterprises operating under the guise of lawful authority.

The Plaintiff therefore seeks judgment against all defendants, jointly and severally, for the full measure of treble damages, in recognition that the enterprise's conduct not only injured an individual, but endangered the legitimacy of the United States and its constitutional framework.

## Summary of RICO Claim

Plaintiff has established all elements necessary to assert a civil RICO claim under **18 U.S.C. §§ 1962(c)–(d)**. Defendants, acting through the IMPD enterprise, engaged in a **pattern of racketeering activity**, consisting of at least two predicate acts: (1) kidnapping and deprivation of civil rights under color of law, in violation of **18 U.S.C. § 242**, and (2) obstruction of justice during Plaintiff's June 22–26, 2025 detention. These acts were conducted pursuant to a common purpose, through the enterprise structure of municipal authority and federal franchise participation, thereby satisfying the statutory enterprise requirement.

Plaintiff has suffered **direct and proximate injury** to both personal and franchise interests, including physical harm, reputational damage, economic loss, and erosion of

constitutional rights. The **treble damages provision of 18 U.S.C. § 1964(c)** justifies an enhanced award, reflecting the severity and systemic nature of the misconduct.

Accordingly, Plaintiff seeks relief for all compensatory, treble, and ancillary damages permitted under RICO, together with costs and reasonable attorney's fees, and asserts that these remedies are fully supported by both statutory authority and the demonstrated pattern of unlawful conduct by the IMPD enterprise.

**Relief Requested**

## Damages Analysis

Due to the nature of this Monell municipal liability, the Plaintiff serves as a Constitutional advocate—a citizen acting on behalf of the civil order and legal integrity of the United States. The claims brought here identify not only personal injuries, but systemic failures that jeopardize the public good and the functional sovereignty of the Constitution itself.

In the post-*Iqbal* and *Twombly* era, 1983 plaintiffs serve a dual role: they both (1) notify the federal judiciary of constitutional violations by local governments and (2) provide the offending municipality with an atlas of its institutional and cultural failure. In this way, Plaintiffs under § 1983 function akin to constitutional consultants, identifying the nodes of dysfunction that give rise to state-sanctioned abuses.

Accordingly, Monell damages must reflect this broader role and encompass three distinct but related elements:

- **Societal damages**, which reflect the communal degradation caused by municipal misconduct;
- **Violations of state tort law**, such as battery and false imprisonment, which are traditionally linked to compensatory frameworks;
- **Violations of criminal statutes or quasi-criminal conduct**, which, though not criminally charged here, still embody state-recognized harms and liabilities.

In this case, the Plaintiff proposes a formulaic, objective, and jurisdictionally respectful approach to quantifying damages. Under 28 U.S.C. § 1367(a), this Court exercises supplemental jurisdiction over the Plaintiff's state-law claims, as they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." This permits the Court to draw upon state criminal and civil statutes as benchmarks for compensatory justice, given that state-law violations "impede the peace and dignity of the State" and impose a conceptual "debt to society."[1]

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), municipalities may be treated as "persons" for the purposes of § 1983 liability. A Monell "person" who commits conduct equivalent to battery, false imprisonment, and negligence—especially when done with threat of deadly force—stands in functional parity with a private citizen who would be criminally punished for such acts.

In accordance with the Fourteenth Amendment's Equal Protection Clause, if an individual would serve time for these offenses, so too should a Monell "person" pay damages equivalent to that social sentence. This equivalence of liability reflects not retribution, but balance—an effort to make society whole.

To calculate damages, Plaintiff employs a baseline public-interest attorney wage of $250/hour, based on the level of complexity, strategic value, and labor performed. At 40

1 As to the legal fiction of a "debt to society," see *State v. Mosley*, 534 N.E.2d 1085, 1088 (Ind. Ct. App. 1989) ("A crime is considered a public offense, an injury not just to the immediate victim but to the peace and dignity of the state itself. That injury creates a debt to society that must be repaid."); see also *Kelly v. Robinson*, 479 U.S. 36, 53 (1986) ("Criminal justice goals are not limited to restitution to the victim. The decision to prosecute and the decision to impose restitution are primarily based on the penal goals of the State and the offender's 'debt to society.'").

hours/week and 52 weeks/year, this yields a salary of $520,000/year[2]. This number is then multiplied by the years of incarceration associated with each state-level offense (battery, false imprisonment, etc.), as if the Monell entity were a criminal defendant. This formula produces a logically sound and publicly justifiable monetary sum grounded in both legal precedent and legislative intent.

Such a damages framework also affirms the Constitution's status as the supreme Law of the Land, not merely within U.S. borders, but as the most venerable and structurally critical sovereign document in the world. See U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land")[3]. The Plaintiff brings this case not only as a victim, but as a vessel of lawful order. This is the work of a Constitutional Advocate.

## Financial Analysis

Plaintiff has plausibly alleged the following Indiana state statutory violations attributable to Monell municipal liability:

1. **Battery** (Indiana Code § 35-42-2-1)– Level 5 Felony – 6-year sentence
2. **Kidnapping (**Indiana Code § 35-42-3-2**)** – Level 3 Felony – 16-year sentence
3. **False Imprisonment** (Criminal Confinement - IN Code § 35-42-3-3)– Level 3 Felony (use of deadly force) – 16-year sentence

---

2 An hourly wage of $50/hour would yield $11,600 per week and $603,200 per year (($50/hour * 40 hours +$75/hour * 128 hours [Overtime])*52 weeks). Prison is constantly occupied time.

3 This framing—of the Constitution as a structural safeguard against localized tyranny—is deeply embedded in American constitutional theory. See *The Federalist No. 51* (Madison): "In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to control the governed; and in the next place oblige it to control itself."

4. **Conspiracy to Commit Sexual Battery** (Sexual Battery - IN Code § 35-42-4-8 Conspiracy IN Code § 35-41-5-2)– Level 4 Felony (based on the severity of the underlying offense of Sexual Battery under threat of deadly force) – 12-year sentence
5. **Official Misconduct** (Indiana Code § 35-44.1-1-1 )– Level 6 Felony – 2.5-year sentence
6. **Harassment** (Ind. Code § 35-45-2-2) - Level 6 Felony -2.5 year sentence
7. **Obstruction of Justice** (18 U.S.C. § 1512 and/or Ind. Code § 35-44.1-2-2) **-** Level 6 Felony – 2.5 year sentence

This results in a total potential state sentencing exposure of **57.5 years**.

Applying the **Monell** damages framework set forth in Plaintiff's damages analysis, this equates to a total baseline amount of **$29,900,000.00** in compensatory damages. Pursuant to the **Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c)**, which mandates that any person injured in their business or property by reason of a RICO violation "*shall recover threefold the damages he sustains*," Plaintiff is entitled to **treble damages**. Accordingly, applying the RICO trebling standard to the established baseline yields a total recoverable amount of **$89,700,000.00**, exclusive of costs, attorney's fees, and any additional equitable or declaratory relief deemed appropriate by the Court.

**Color of Law Statement**

At all relevant times, the actions of Defendants, including officers E125, E124, E190, and E290, as well as any other named or unnamed IMPD personnel involved in the incidents of January 22–23, February 25, and June 22–26, 2025, were taken **under the color of law**, as defined by 42 U.S.C. § 1983.

Defendants were acting **in their official capacities as officers of the Indianapolis Metropolitan Police Department**, and in the performance of duties authorized by local, state, and federal law. These actions were taken pursuant to the authority of their offices, including law enforcement powers, detention authority, and custody procedures.

Through these actions, Defendants **willfully and intentionally deprived Plaintiff Aaron Singer of rights secured by the United States Constitution**, including but not limited to the First, Fourth, and Fourteenth Amendments, and committed multiple violations of Indiana state law, including battery, kidnapping, false imprisonment, harassment, conspiracy to commit sexual battery, obstruction of justice, and official misconduct.

Defendants' conduct—ranging from unlawful detention, physical abuse, and sexual humiliation, to intimidation and obstruction of justice—was **not a departure from official duties**, but rather executed **under the authority of their positions**, in the course of performing "official acts" on behalf of the City of Indianapolis and the IMPD. By abusing this authority, Defendants exploited the powers vested in them by law to achieve unlawful objectives, thereby acting **under color of law**.

Accordingly, the Plaintiff brings this action against Defendants under 42 U.S.C. § 1983 and related state law claims for violations committed **under color of law**, establishing liability for the municipal defendants under **Monell v. Department of Social Services, 436 U.S. 658 (1978)**, and for individual officers under direct liability principles.

**Aaron Singer**
Pro Se Plaintiff
943-900-2245
aaron@amsinger.org

DATE: ___10/27/2025__

SIGNATURE:



CERTIFICATE OF SERVICE

I certify that a copy of this **FIRST AMENDED COMPLAINT** and related exhibits have been

1090 sent (emailed) to:

Brian Coppinger: brian.coppinger2@indy.gov

Caitlin Wilkinson: Caitlin.Wilkinson2@indy.gov

Date: 10/27/2025

